May it please the Court, Counsel, my name is Greg Silvey and I represent Cherie Dillon. So I'd like to begin at the end and refer to the government's final brief in this case where the government finally makes or finally acknowledges an argument I've been making throughout my briefing which is about the supervision of Cherie Dillon as a dental hygienist and the government calls my argument absurd so I know I must be doing something right. Basically there is a fundamental misunderstanding by the government and the court in this case about what it means to be supervised as a dental hygienist. I think your argument about general supervision is well taken but I don't see anywhere where you show evidence that she was generally supervised. So, well, and actually that's an excellent point. The government didn't, actually this is the government's burden, the government never showed that she was not generally supervised. So we have the indictment just says that she's not direct, there's no direct nor indirect supervision. It says there was no dentist in the office and therefore she wasn't directly or indirectly supervised. They springboard that into, that becomes a scheme that the entire business is a scam. So the government actually produces their witness that explains what general supervision is. There is absolutely no proof that she had any claim that would have been direct or indirect supervision. They produce the coding chart where the only thing that's direct or indirect, actually it was indirect, was the application of nitrous oxide. There's no allegation that she did that. But what we know is, so general supervision is just basically about a dentist authorizing a treatment. And what's important here... They have quite a bit of evidence that she didn't have authorization of the treatment in terms of the treatment plans. I appreciate that your argument is that as to the contract dentist, they came in, did their own independent examinations and then performed the services. I understand that. But it still seems to me that in your briefing where you draw the distinction, and I don't mean to imply that the government has conceded their argument that a higher level of supervision was required. But even accepting your argument that general supervision was sufficient, it doesn't seem to me that that was the case here at all. Okay, so I'll go back a minute. All right. Number one is, in my what would be the yellow brief, I have the Idaho statute of what general supervision means. Right. And in the trial, there was a letter that was written to Sherry Dillon that was admitted ostensibly for notice from the dental commission, the dental board. And it said that, and it's part of the sentencing material as well, but it says that a dental hygienist basically must have written authority. There needs to be chart notes from a dentist saying what you can do. That was amended, and at the time of the case, there didn't need to be written notes. It didn't need to be in writing. So basically from the statute, authority, general supervision just means authority for treatment. It is as simple as a dentist saying this patient needs to have his or her teeth cleaned. That is authority. It's not about a master-servant relationship. It's not who's supervising who. It is a dentist saying do this. Right. We understand that. I think your point, that point is well briefed. Okay, so I'm trying to get to the point, the question you're asking. So a dentist does not have to be in the office while these things are occurring. So Dr. Fricke, we know that he was there in 2010, at least up into July. So Dr. Fricke is there also, and this was testimony from the dental board, that a hygienist can perform a treatment up to 12 months after when the patient was seen by the dentist. But Fricke's at least there until July. And somehow this becomes, somehow all of 2010 becomes fraudulent for her hygiene. So Fricke's there for part of that. So I don't know how they get to it's all fraudulent. Fricke, she can actually perform these treatments for a year after that Fricke has seen patients, but that still all becomes fraudulent somehow. And then contract dentists are working for years. And, I mean, it's as simple of a matter of that contract dentist, when she's assisting in drilling and filling, as they say, this patient needs to have his or her teeth cleaned. That would suffice as general supervision. So the government never. And after the dentist leaves the state? It doesn't have to be. I'm just asking as a practical matter. Correct, as a practical matter. So you really have, I mean, I understand the rationale of saying you don't have to do it tomorrow or even next week or even next month. But if the dentist leaves the state completely, she's basically unsupervised, isn't she? So there's two branches of supervision here. There is what we're talking about and employment law. I apologize. I was actually in a law library with real books, and I remembered that we used to call employment law master-servant law. But there's employment law supervision, and then there is statutory dental law. You've got to read some common sense into the law. I'm not saying that it's not really an employment law situation. It's a practical reality. We also have contract dentists. Isn't part of the rationale, though, for the supervision requirement that if there's a problem, there will be a dentist there to deal with it? Well, no, because general supervision, the dentist doesn't have to be in the building. But available in some sense. That's why I'm asking if you leave the state. Well, we have contract dentists. I mean, we have dentists there. But it's not the dentist that authorized the surgery. I mean, excuse me, the procedure. But one of the reasons why the government should not be just pulling up new theories of sentencing are the contract dentists were actually on the stand at trial. And some of the time they were in the office. Correct. And did you argue before the district court that their supervision was adequate? It was never brought up in the district court when they were on trial or during the trial. Sentencing, did you make this argument? I didn't represent the defendant. Was it made, counsel? This shouldn't be that hard. I'm just trying to. Yes, I know it was talked about, put it that way. And I know that the court rejected it. But talked about in what way? I know that the prosecutor was saying it was not good enough. That's what I recall. Defense attorney didn't really make a lot of sentencing arguments, put it that way. So he was not specifically responding to government arguments like that. Yeah, I had, now I may be wrong about this, but I had the impression that the primary argument that was being made was really one about notice rather than about the content of whose billings should and should not be included in the total. And that the discussion that you're having with Judge Christin was not had. That's part of the notice argument, though. It's how we take the indictment that says this and all of a sudden we have all the billings from the contract dentists and all the billings from Sherry Diller. But I really read the, forgive me for interrupting, I really read the notice argument very differently. I read the notice argument, and I'm concerned that the district court understood your notice argument to be that at the time she entered her plea, she thought that the superseding indictment was such, and more importantly the government's case was such, that they never contemplated this much larger forfeiture and restitution number. Correct. Correct. And I was just trying to explain the difference in view of supervision is how it goes from 126 to. . . Right, and I think that's well briefed, and I appreciate the argument. I'm just trying to get at what this is a much more specific argument than what I understood to be discussed at sentencing. And I'm just inviting you to tell me if I've missed it and really that that was packaged in there in a way where the district court had fair notice and an opportunity to rule on this. No, I was just trying to make a very specific argument about how a, I just believe the court never got, so to speak, the supervision argument throughout this. It's that you just looked at the indictment, said all the dental hygiene billings are in there somehow, which I don't believe is the case, and all the contract billing, dentist billings are in there somehow, which I do not believe the case. And that is. . . May I ask you about the notice question in terms of the amount of forfeiture? Of course. So after the guilty plea is entered, the court basically says something to the effect she's now subject to forfeiture proceedings and the government is going to pursue the amount you've just recited and perhaps more. And so she's on notice of at least that amount. Given the sequence of events, what's your best argument then for the fact that she didn't have notice that the claimed forfeiture amount at that time could not in fact be increased? Because it had been reduced. I mean, just pure logic and common sense. If I say, if I start with this number, I reduce it to this, then. . . What does and perhaps more mean? Would go up to basically. . . Up to what? The penny under the first number. If I tell you that I want this from you and, no, I want a lower number from you but maybe more, you would not possibly be thinking that the number I want from you is four times more than the original thing. That's not how our brains work. That is not logic or common sense. But what tells you you have to have the precise number when you have notice that you're subject to a forfeiture? You don't have to have a precise number, but by reducing under a number, that number is no longer on the table. And your support for that is? No, your support for that is? What possible reason did the prosecutor have by reducing the number if, as the government is pointing out in their brief, they knew from the beginning that this forfeiture number was going to be many, multiple times what the original number was, why in the world did they go from 143 to 126? What was the possible purpose for that? Did your client ever seek to withdraw her plea? No, she did not. Well, perhaps we can ask the government the question. . . You have exceeded your time. Yes. Thank you. Thank you. May it please the Court. Serena Case Hargrove on behalf of the United States. Your Honors, the District Court found that the government had proved that the entire business was a fraud from 2010 to 2013. So that was a finding made by the District Court. It's noted in the District Court's decision on page 8 of the excerpts of record. And that finding is crucial to both rebutting the defense's argument and then also to the government's argument about restitution. The Court also found, and it noted in Musings during the sentencing hearing, that it could acknowledge that patients did not get compliant care. And that the government had established. . . Is that true with respect to the contract dentists as well? It is, Your Honor. Why? I'll explain why. The contract dentists were operating under treatment plans that a dental hygienist, posing as a dentist, had created. But they testified they did their independent examinations before they. . . For me, this is the toughest part of your argument. Yes. They stepped in. They said they did independent examinations before they performed their services. Why isn't that enough to constitute superseding cause or intervening cause? It's not a but-for causation standard under the MVRA. So to cut to the chase. Absolutely. Your Honor, there was a patient named Mary Morrison who testified. And her testimony is summarized in the pre-sentence report in paragraphs 27 and 34. I regret that we didn't actually include the testimony in our excerpts. But she explained that she met with Sherry Dillon over five years. She had a number of fillings done by Ms. Dillon. And previously, she had met with Dr. Fricke in 2007. And he had done some treatment for her. But she never saw Dr. Fricke again after that. Now, after treating her for five years, Ms. Dillon, a dental hygienist, determined that dentures were appropriate for Ms. Morrison. And so Ms. Dillon created a treatment plan that involved taking all the steps necessary to get dentures done. And so she took impressions. She ordered the dentures. And she requested Dr. Baird, who was indeed a licensed dentist, to extract all of Mary Morrison's top deck teeth. So when Dr. Baird. And was that done? That was done. Now, that may have been done very skillfully. It was. Dr. Baird is an excellent dentist, I'm sure. But no one ever reviewed, no dentist ever reviewed the decision that Mary Morrison was appropriate for dentures. Well, wait a minute. Is Dr. Baird one of the dentists? Contract dentist. Yes, but is he one of the dentists who testified? Yes, Your Honor. And my understanding, please correct me if I'm wrong, my understanding is those, is it three, contract dentists testified that they did their own independent examinations. Do I have that wrong? No, Your Honor, that is correct. But they were not reevaluating, they were not questioning the entire treatment plan. Did he say that? Did Baird say that? No, Your Honor, he didn't. And he wasn't asked the specific questions about Ms. Morrison. But I think when you consider it as a matter of logic, if you have, say, a senior partner working on a case, and they say, here's our overall plan. Matter of logic doesn't help me very much because I'm not a dentist. I really don't, you know, that's not what we do for a living. And so it's tough for us to second guess this part of it. If we've got testimony and we have the standard we have, which is really a proximate cost standard, and an independent dentist comes in and says, I wasn't just blindly executing a treatment plan. This is my summary, summation of the evidence. I wasn't just executing the treatment plan. I performed my own independent exam. That's where I have a problem with this portion of the restitution order. Yes. The dentist also acknowledged, though, that they believed Dr. Fricke was the one who had the long-term face-to-face patient relationship with these patients, and that Dr. Fricke in Mary Morrison's case, they believed that Dr. Fricke had seen this patient for five years and had, after consulting with her, determined that dentures were appropriate for her. Now, there may have been nothing that suggested they were grossly inappropriate. And I think, you know, Dr. Baird testified he did his own exam. So, yes, I think he would have seen something that was terribly inappropriate. But when you have a colleague who is the primary dentist in the practice, well, you think you have a colleague, telling you to extract someone's teeth because they're appropriate for dentures, you know, that is very different than if Dr. Baird were Mary Morrison's dentist and he had been evaluating her. Your brief reads as though, under the MVRA, which, of course, is very expansive, but it's not limitless. Your brief reads, I think, as though the government's arguing a but-for standard. You know, the insurance agent said they would not have paid this had they known, as opposed to acknowledging our case law, the Swore case, for example, that talks about approximate causation standards. So I just want to be sure what the government's position is on causation, please. Certainly, Your Honor. The government's position is that we proved that had Medicaid known and had the insurance companies and employers known that Ms. Dillon was operating the way that she was, they would have paid absolutely nothing because that entire business was a fraud and that it wasn't just a matter of contract, although the contracts are very important, but it was a matter of public health because she was violating a great number of things that the dental board, that state law required. And so for that reason, that's where the Hunter case comes in. And Hunter explained that, and it cited a Sixth Circuit case favorably, Kaminsky, explaining that when the insurer or the patient doesn't get what they paid for, which is compliant, high-quality services, that is loss. And so the district court's findings that the patients did not get compliant care, that the insurance never would have paid, and that the entire business was a fraud, those findings lead inevitably to a greater amount of loss than the district court was awarding. Now, Hunter acknowledged, I think, some discretion in there. And in that case, the district court held that this nurse, who had fraudulently misrepresented her licensing, she did not have to be reimbursed for things that did not require a nurse's license. The court was well within its discretion, the Hunter court held, not to pay her back, even though there was no need for a license for those particular tasks. But Hunter, in the course of doing that, explained that when there are public health requirements at issue, that is very different, and it's very important not to tread upon those. That's the government's concern here, that the defendant had contract dentists who were operating under the absolutely mistaken impression that a face-to-face dentist with a long-term relationship with his patients was recommending care, and they were helping to execute that care, and that there was absolutely no supervision over Ms. Dillon. She ran the entire business. Essentially, she supervised the contract dentists, both as a business person and then also by pretending to be Dr. Fricke. So if I understand your argument, in part it is that the independent evaluation was independent, but in a context in which there would have been a different and more thorough examination had they known what was going on. Precisely, Your Honor. And there would have been a... Excuse me, is there any evidence of that? I just didn't see it. And I'm happy to go back and reread what the three dentists testified to, but that's my problem right there, and that's the part where it's tough for me because I'm not a dentist. Right, right. When they say they performed their independent exams, I didn't see them saying, had I known, I would have done my exam differently. Is it in there? No, Your Honor, not from those dentists. However, there are calendars. There are extensive calendars. And the fact of the matter is those dentists believe Dr. Fricke was there Monday through Thursday and that he was the one with his name that was going on. He was the head dentist in this office. This was his practice, they thought. And so Monday through Thursday, he is meeting with those patients. They are his patients. And then they are absolutely dentists, and they are acting to help Dr. Fricke, sometimes every other Friday, sometimes every third Friday. For some of them, for a period of time, it was every Friday. But they believed, and Ms. Dillon continually told them, that Dr. Fricke was still active and he was the one with that relationship. I also didn't see that those dentists ever said that they thought they were supervising Ms. Dillon. That's correct, Your Honor. Generally or otherwise. That's correct, Your Honor. Yes. And that, too, goes along with the finding that the entire business was a fraud. The dental board doesn't even allow dental hygienists to own these practices. A dentist is supposed to own the practice. So, no, she was never supervised adequately. And there is good, there's helpful testimony from Kristen Calley, who is our dental hygienist expert, in the excerpts of record at 307 about what's required for both general and direct supervision.  Thank you, counsel. Thank you, Your Honors. The government requests that you reverse the restitution order. You did not reserve rebuttal time, but we'll give you a minute if you'd like it. Thank you, Your Honor. The perfect example of that these schemes were not in the indictment nor part of the trial is nobody was asked these questions, which are now vital at sentencing and restitution. Nobody asked the contract dentist, did you ever tell Sherry Dillon to clean a patient's teeth, which would be general supervision. Nobody asked them what sort of examination did you give to a client. I know the court is interested in the restitution issue, but it is also vital to what scheme is charged, and it's vital to the notice and the voluntariness of the guilty plea. These things just all came up after the fact. The government has been insisting that they have been part of the case since the inception in the indictment, and they simply have not been. A fair reading of the indictment does not include claims for the contract dentist or claims for the dental hygiene that was done under general supervision, which could have been Dr. Fricke being there in 2010, pursuant to his written orders after he was not in the office, or pursuant to treatment ordered by a contract dentist. Thank you, counsel. We appreciate the arguments from both counsel. The case just argued is submitted.
judges: McKeown, Graber, Christen